## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CAROL MUSZIK,

     Plaintiff,

v.                                    Case No: 8:22-cv-2387-CEH-SPF

TOWN OF REDINGTON SHORES,
FLORIDA and MARYBETH
HENDERSON,

     Defendants.

---

### ORDER

This matter comes before the Court on Defendants Town of Redington Shores, Florida ("the Town") and Marybeth Henderson's Dispositive Motion for Summary Judgment (Doc. 23), Plaintiff Carol Muszik's response in opposition (Doc. 27), and Defendants' reply (Doc. 28). Plaintiff alleges that Defendants retaliated against her for exercising her First Amendment rights.

Having considered the motion, the response in opposition, the reply, and the parties' Stipulation of Agreed Material Facts (Doc. 30), the Court will grant the motion as to Count I, and deny-in-part the motion as to Count II.

## I.    FACTS[1]

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including declarations and exhibits, as well as the parties' Stipulation of Agreed Material Facts (Doc. 30). For purposes of summary judgment, the Court considers the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

Plaintiff Carol Muszik purchased a beachfront duplex located at 17820 Lee Avenue ("17820") in Defendant Town of Redington Shores, Florida, in March 2017. Doc. 30 ¶ 4. She then converted the duplex into a large, single-family home that she rented to vacationers. *Id.*; Doc. 27-1 ¶ 5. In February 2019, Muszik purchased the property next door, at 17822 Lee Avenue ("17822"). Doc. 30 ¶ 5. She planned to demolish the house and build a larger home that she would also rent out. Doc. 27-1 ¶ 18. The second property was located next door to the beachfront home of Defendant Mary Beth Henderson, a Redington Shores commissioner who became the mayor in 2018. Doc. 30 ¶ 2.

### A. Henderson's Mayoral Authority

The Town Charter provides that the mayor is primarily a ceremonial title for one of the Town Commissioners, with control over the municipal government vested in the Town Commission as a whole. *See* Doc. 23 at 28. As mayor, Henderson had the authority to preside over Town meetings and to appoint commissioners to specific positions of responsibility, the most significant of which were the Building Commissioner, the Code Enforcement Commissioner, and the Administrative Commissioner. *Id.*; Doc. 23-17 at 72, 98. Henderson held all three of these positions during her tenure as mayor; at one point she held them all at the same time. *Id.* Henderson also exercised the authority to remove commissioners from those positions. *Id.* at 72. For example, Commissioner Linda Krouk testified that in January 2022 Henderson removed her from the position of Building Commissioner without explanation and assumed it herself, while Henderson was already serving as the Code

Enforcement Commissioner. *Id.* at 53, 71-73.[2]  Henderson had previously served as the Building Commissioner until Krouk's election in 2021. *Id.* at 18, 20; Doc. 23-8 at 22; Doc. 23-3 at 10.  The Building Commissioner was responsible for overseeing the Building Department, signing off on permits, and supervising the Building Official,[3] although the Building Official was the only person who could enforce the building code. Doc. 23-3 at 9-14; Doc. 23-8 at 6, 21.

Henderson also possessed some unofficial authority while serving as the mayor. Two fellow commissioners, Krouk and Linda Blackburn, testified that Henderson often said she had "moles" who would tell her things and take action on her behalf. Doc. 23-17 at 83, 85; Doc. 23-14 at 75-76; *see also* Doc. 23-21 at 49 (same, from a third witness).  Henderson had a very close relationship with the Town Clerk, Mary Palmer, and usually worked out of Palmer's office. Doc. 23-17 at 12.; Doc. 23-21 at 17; Doc. 23-14 at 14, 25.  Blackburn testified that she could not "imagine [Palmer] doing something that the mayor wouldn't approve of." *Id.* at 25.  Palmer automatically received a copy of all commissioners' emails in her own inbox, and Krouk and Blackburn either observed or had reason to believe Henderson read Town officials' emails from Palmer's desktop.  Doc. 23-14 at 14-15; Doc. 23-17 at 94-97.  Henderson

---

[2] The Town Commission later voted to change the Town policy manual to remove the responsibility of appointing commissioner positions from the mayor. Doc. 23-17 at 73-74.

[3] For example, a Building Official asked Henderson whether he should be the one to issue a Notice of Violation to Carol Muszik for a reported issue or have Code Enforcement do so. Doc. 23-3 at 33, 110.

also had access to all their email account passwords, including Palmer's, and phone records. *Id.* at 93; Doc. 23-14 at 74-75.

### B. Muszik's Public Advocacy and Variance Dispute

Carol Muszik regularly spoke at Town meetings on a variety of topics, beginning in 2019 and continuing even after she no longer owned property in the Town. *See* Doc. 23-22. She also made a habit of sending lengthy emails to Town commissioners to share her views, many of which were critical of Henderson and other officials. *Id.*

One topic of Muszik's public comments was a proposed vacation rental ordinance. Her properties were the frequent subject of neighbor complaints over negative impacts from vacation rental customers. *Id.* ¶¶ 6-7; Doc. 23-15 at 18-20. Henderson often complained to friends about Muszik's rentals. Doc. 23-17 at 15; Doc. 23-21 at 8. Leslee Coppock, who lived across the street, called Town officials time and time again to report noise, code violations, and related issues at the houses. *Id.* at 15-20, 60-61.[4] Coppock was part of a group of Lee Avenue neighbors who lobbied the Town Commission to pass regulations governing short-term rentals in 2020. Doc. 23-15 at 24, 39, 59, 63-64. At Town meetings, Coppock, Henderson, and other residents often identified Muszik's properties as problems or examples of why the Town needed

---

[4] Coppock also reported a suspected code violation involving Muszik's ground floor renovations to Commissioner Jennie Blackburn, who investigated and passed it on to Bruce Cooper to address. Doc. 23-15 at 61; Doc. 23-14 at 28-32. There is no evidence Henderson was involved in making this report. *See* Doc. 23-2 at 118-119.

such regulations. Doc. 27-1 ¶ 35.[5]  In turn, Muszik regularly voiced her opposition to the proposed short-term rental regulations. *Id.*; Doc. 23-22.

Another topic Muszik or her attorney addressed at Town meetings was a variance that she was seeking for the new house she planned to construct at 17822. She applied for variances of setback requirements in the front, side, and rear of the property. Doc. 27-1 ¶¶ 20-21.  A special magistrate granted her application as to the front and side setback requirements but denied it as to the rear, which is the beachfront side. Doc. 30 ¶ 14.  The rear setback variance that was denied was identical to variances granted to neighboring Lee Avenue properties, including Henderson's. Doc. 27-1 ¶ 20.  The Town Commission affirmed the denial in late 2019, in a vote from which Henderson abstained due to a conflict of interest as the property's next-door neighbor. *Id.* ¶¶ 27-30; *see* Doc. 23-12 at 280.

In an effort to mediate the denial, Muszik commenced a dispute resolution proceeding pursuant to Florida Statutes § 70.51 in February 2020. Doc. 27-1 ¶ 32.  The matter was discussed at Town meetings in the fall of 2020, after a different special magistrate recommended a resolution—with which the Town's representative, Vice Mayor Michael Robinson initially agreed—that would have permitted the variance while also changing the section of the Town's Land Development Code that prohibited it. Doc. 23-12 at 307-322.  The Commission, including Henderson and Robinson,

---

[5] Henderson did not participate directly in the advocacy for short-term rental regulations, however, because she viewed it as a conflict of interest that she owned a rental home and lived next door to Muszik's. *See* Doc. 23-15 at 24; Doc. 23-12 at 296 (recusing herself from the vote).

voted to reject the magistrate's recommendation on November 19, 2020. *Id.* at 318, 321.

### C. Muszik's Lawsuits and the Instant Action

Muszik has sued the Town and/or Henderson on more than one occasion. She unsuccessfully challenged the vacation rental ordinance in federal and state lawsuits spanning from December 2020 through December 2022. *See Management Properties, LLC v. Town of Redington Shores, Fla.*, No. 8:20-cv-2984-VMC-AEP (M.D. Fla.); *Management Properties, LLC v. Town of Redington Shores, Fla.*, 352 So.3d 909 (Fla. 2d DCA 2022). She also initiated a prior version of the instant First Amendment retaliation lawsuit in February 2021, before voluntarily dismissing it in September 2021 while discovery was ongoing. *See Muszik v. Town of Redington Shores, Fla. et al.*, No. 8:21-cv-293-SDM-CPT (M.D. Fla.).

Muszik filed the instant action in October 2022, alleging that Henderson, in her individual capacity (Count I), and the Town, through Henderson as its policymaker (Count II), committed First Amendment Retaliation. Doc. 1. She alleges that she engaged in activities that are protected by the First Amendment when she:

    (i)    attended public meetings and publicly voiced her concerns regarding Town business including the vacation rental ordinance;

    (ii)    initiated statutory dispute resolution proceedings against the Town;

    (iii)    sued the Town for First Amendment retaliation; and

    (iv)    paid for a political advertisement in support of Henderson's opponent.

*Id.* ¶ 42(a).[6]   Muszik further alleges that Henderson and the Town, through Henderson, retaliated against her through "a course of conduct designed to harass, intimidate, and punish [her] for exercising her First Amendment rights." *Id.* ¶ 43.   The course of conduct allegedly took the form of the following five incidents:[7]

### 1. *Code Violation Inspections*

First, Muszik alleges that Henderson directed Town officials to "inspect for suspected code violations to intimidate [Muszik] in advance of a public hearing where the Town was scheduled to consider the vacation rental ordinance that Muszik vocally opposed." Doc. 1 ¶ 43(i).   According to Muszik, then-Building Official Bruce Cooper inspected her house at 17820 on at least two occasions before scheduled Town meetings in the summer of 2020.   Doc. 27-1 ¶ 38.   She alleges that Cooper told her Henderson "called him virtually every time she saw a maintenance worker show up" at 17820, although Cooper did not recall this at his deposition. Doc. 27-1 ¶ 38; Doc. 23-3.

---

[6] The Complaint contains some duplicative paragraph numbers.  This Order uses (a) and (b) to differentiate between them.

[7] Both parties' motion papers include arguments about two additional incidents, in which Henderson restricted Muszik from speaking during the public comment section of Commission meetings. Doc. 23 at 12-14; Doc. 27 at 19-20.  Although these incidents were described in the Complaint, along with many other events that comprised the turbulent history between Muszik and the Town, the Complaint did not identify them among the particular incidents it was alleging constituted adverse actions for Plaintiff's First Amendment retaliation claims. *See* Doc. 1 ¶ 44.  It is well-settled that a party may not amend its complaint through arguments in a brief opposing summary judgment. *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).  Accordingly, only the five identified incidents will be considered.

Henderson, a self-described "rule follower," had a practice of reporting potential code violation issues throughout the Town, including at Muszik's properties, both before and after becoming the mayor. Doc. 23-21 at 50-51; Doc. 23-12 at 49, 189-90. Code enforcement officer Danny Doherty testified that Henderson frequently referred possible violations to him, though he did not recall any involving Muszik. Doc. 23-4 at 48-49. She would also ask the Building Official to check to see if a permit had been pulled whenever she observed work being done on a property, and to investigate if there was no permit. *Id.* at 61-62. Henderson testified that she asked Cooper to investigate the possibility of unpermitted work at 17820 at least once. *Id.* at 61-63. Cooper determined that Henderson's report was accurate and the electrical work did not have the required permit. Doc. 23-2 at 120, 122.[8] This incident is one Muszik identified as retaliation occurring before a Town meeting. Doc. 27-1 ¶ 38.

### 2. *Homestead Fraud Investigation*

Next, Muszik alleges that Henderson and the Town investigated "Muszik's compliance with property tax laws, which included directing a deputy to confront the people staying at [the] property and publicly accusing Muszik of homestead fraud to intimidate and punish Muszik" in advance of a Town meeting where a settlement of her dispute resolution proceeding would be considered. Doc. 1 ¶ 43(ii).

---

[8] Henderson also instructed then-Building Official Steven Andrews in 2017 or 2018 to "make sure" Muszik's construction on 17820 met the flood requirements, and later followed up with him to ask why he issued a permit. Doc. 23-6 at 17-19. Andrews testified that it was not unusual for commissioners to take an interest in or give him a heads up about a particular project, but they never attempted to exert influence. *Id.* In any event, Muszik's renovation predated her First Amendment activity.

During the pre-vote discussion of Muszik's 70.51 settlement at the Town meeting on November 19, 2020, Henderson stated that she had undertaken an investigation of Muszik's property tax compliance and learned that Muszik was committing fraud by claiming a homestead exemption for a property she rented out. *Id.* at 321, 326.  Henderson had contacted the county Property Appraiser's Office to report the alleged fraud; she viewed making the report as her "fiduciary responsibility" and did it in her role as the mayor rather than as a resident. Doc. 23-12 at 118, 326. Terri Pettay, an auditor with the Property Appraiser's Office, testified that "the mayor of Reddington Shores" called her twice in November 2020 to report that 17822 was being rented. Doc. 23-10 at 17-18.  Pettay investigated after the first call without learning anything. *Id.*  When Pettay was unavailable to investigate on the day of the second call, November 17, 2020, Henderson offered to send a member of local law enforcement to investigate instead. *Id.* at 20-21; Doc. 1-3 ¶ 8.  Henderson then called Daniel Doherty, a part-time code enforcement officer for the Town, to ask him to make contact with the renters at 17822. Doc. 23-4 at 27.  Although Doherty had just arrived home after going off-duty, the mayor conveyed that the matter was urgent, so he drove to 17822 and confirmed that the people staying there were short-term renters. *Id.* at 26-27, 29-30.  He would not have done the same if Henderson's request had come from a resident rather than a Town official. *Id.* at 57-58.  He had never been involved in a tax-related investigation before. *Id.* at 28; Doc. 23-12 at 115.  Despite Doherty's report, the fraud complaint was unfounded. Doc. 23-10 at 24.  Pettay explained that a homestead fraud complaint will be considered unfounded unless she can confirm that it is rented

for 30 days or more for two consecutive years after claiming homestead. *Id.* at 13, 27, 35.   She has received other complaints about 17822 over the years but has never confirmed a violation. *Id.* at 13, 17, 28, 30-31, 33.   Although Henderson has reported other properties for homestead fraud, both before and after becoming the mayor, 17822 is the only property Pettay and Henderson have ever spoken about. Doc. 23-12 at 114; Doc. 23-10 at 23.

### 3. *Election Complaint*

Muszik next alleges that Henderson and the Town directed the Town Clerk to make an unfounded complaint to the Florida Election Commission ("FEC"), in retaliation for Muszik publishing a paid political advertisement in support of Henderson's opponent in the mayoral election. Doc. 1 ¶ 43(iii).

Henderson was reelected mayor in March 2021.   Leading up to the election, Muszik was a vocal supporter of Henderson's opponent, Commissioner Jeff Neal. Doc. 30 ¶ 20.   On February 25, 2021, she published a political advertisement in the local newspaper that was critical of Henderson. *Id.*   Town Clerk Mary Palmer, who served as the Town's supervisor of elections, submitted a complaint about the ad to the FEC on the same day. *Id.*   The FEC sent Muszik a letter notifying her that she was under investigation for violating Florida election laws and that she could be subject to a fine if found guilty, causing Muszik to consult with an attorney and decide not to publish a second ad. Doc. 27-1 ¶ 56.   The FEC complaint was dismissed several months later. *Id.*   Palmer testified at her deposition that she does not remember what she thought was wrong with the ad; viewing the ad and her FEC complaint did not

refresh her recollection. Doc. 23-20 at 69-76.   Palmer had never filed an election complaint before. *Id.* at 75.   Palmer and Henderson denied that Henderson had any involvement in the complaint. *Id.* at 125; Doc. 23-12 at 131-134.

### 4. *Stop Work Order*

Next, Muszik alleges that Henderson and the Town directed the Building Official to issue a Stop Work Order ("SWO") to her contractor in advance of depositions scheduled in her prior First Amendment retaliation lawsuit. Doc. 1 ¶ 43(iv).

Muszik began constructing the new house at 17822 in May or June of 2021. Doc. 30 ¶ 22.   On June 16, 2021, then-Building Official Neal Mazzei issued a SWO that halted construction and ultimately set the project back more than two months. *Id.* ¶ 23; Doc. 27-1 ¶ 58.   Mazzei cited a building code provision that purportedly mandated notice to adjacent properties—in this case, only Henderson's—before pile-driving work could begin. Doc. 23-12 at 380.   Neither the Town nor any of its neighboring communities had ever enforced this provision before. Doc. 23-8 at 24-25. Muszik offered evidence that the requirement did not apply to her project. *See* Doc. 27-2 (expert affidavit opining that notice was not required).

Henderson had reported Muszik's project to Mazzei and told him that she wanted him to strictly enforce the notice requirement. Doc. 23-12 at 138-140; Doc. 23-8 at 19, 26-27, 49.   Mazzei testified that he would not have taken the same actions if Henderson had not told him to, although he denies that he would apply the building code incorrectly even if a Town official directed him to. *Id.*, 42-43.   The Town also

received complaints about the same issue with respect to a different construction project during the same week, and Mazzei does not remember which complaints occurred first. Doc. 23-8 at 24, 26, 41; Doc. 23-17 at 57.  One witness testified that she had repeatedly contacted Town officials about the other construction project and the notice she believed the building code required, and she thought her neighbors likely did the same. Doc. 23-16 at 43-50.  Henderson stated that she learned about the need for notice of Muszik's project from the complaints Town Hall received about the other project. Doc. 23-12 at 138-139.

### 5. *Title Company Request and Closing Delay*

Lastly, Muszik alleges that Henderson and the Town retaliated against her by falsely responding to a municipal lien search during the sale of her property at 17820. Doc. 1 ¶ 43(v).

Muszik decided to sell 17820 in 2021. Doc. 27-1 ¶ 59.  In advance of the closing in August and September 2021, the title company contacted the Town to request the property's "complete permit history, including all open, expired, and closed permits that may exist, as well as all open or closed code enforcement cases found on record" for the property, and any pending or active liens. Doc. 23-12 at 392.  The Town then sent Doherty, the code enforcement officer, to the house to do an inspection for any existing issues.  Although the title company clarified to the Town that it was not requesting an inspection, several witnesses testified that Doherty was acting in accordance with the Town's practice at the time. Doc. 23-20 at 124; Doc. 23-23 at 7-

8; 23-1 ¶¶ 12-13.  Muszik declined permission for Doherty to conduct an inspection, which he reported back to the Town. Doc. 23-12 at 398.

The Town returned the form to the title company with a notation that the property had open code violations and open and expired permits. *Id.* at 392.  When the company asked for more information, the Town sent back documents indicating that a code violation investigation that began in 2017 remained unresolved. Doc. 23-20 at 204-206. Among the documents was a 2020 email from then-Building Official Cooper to Muszik, in which he had forwarded a report from Commissioner Blackburn that she believed the ground floor of 17820 contained unpermitted and impermissible improvements. *Id.* at 221, 228; *see supra* n. 3.  In the 2020 email, Cooper had informed Muszik that he "would like to perform an onsite inspection so I can determine the extent of the possible violations." Doc. 23-20 at 221.  In September 2021, in response to the title company's request, Mary Palmer pasted Cooper's 2020 message into an email to Doherty, the Town Building Department, and the title company. *Id.*  Above the 2020 message she wrote, "I believe this is the only existing violation this [sic] property." *Id.*  Below the 2020 message she wrote, "The bottom floor needs to be inspected to close out the open permits." *Id.*  The phrase "the extent of the possible violations" in Cooper's message was underlined by hand, with a note in Mary Palmer's handwriting that read: "This has not been closed out. MP." *Id.* at 221, 85-87. At her deposition, Palmer did not recall sending the email or making the handwritten note, nor could she explain why she had done so. *Id.*  She and Henderson denied that

Henderson was involved in the title company request or related correspondence. *Id.* at 96; Doc. 23-12 at 152-156.

Muszik had removed the unpermitted improvements to 17820's ground floor during renovations in 2017 and 2018 at the Town's direction. Doc. 27-1 ¶¶ 14-15. Then-Building Inspector Joseph Walker took photos confirming that the plumbing was removed and filled out a final inspection form verifying that the issue was resolved. *Id.*; Doc. 23-20 at 224; Doc. 23-5 at 7-9.  When Muszik received Cooper's 2020 email about Blackburn's report of the same issue, she told him that the Town had already addressed it; Muszik never received a response or follow-up contact. Doc. 27-1 ¶¶ 42-43.  In 2021, at the time of the title company's inquiry, the Town represented that it did not have a record of Walker's final inspection or any indication that the issue was resolved. *Id.* ¶¶ 64-65.  Even after Muszik provided Walker's report to the Town, Town officials maintained that a new inspection was necessary before it would correct its representation to the title company. *Id.*; Doc. 23-20 at 232-233.  The incorrect information delayed the closing by more than two months, jeopardizing the sale and costing Muszik mortgage interest. Doc. 27-1 ¶ 66.

### D. Motion for Summary Judgment

Defendants now move for summary judgment on both counts. Doc. 23.  With respect to the allegedly retaliatory acts, Defendants argue that there is no reliable evidence Henderson was involved in the FEC complaint or the title company request. *Id.* at 15, 18-20.  Moreover, her actions in reporting a suspected code violation, homestead fraud, and the lack of notice of pile driving fell within her duties as a

Commissioner and her First Amendment rights as a citizen. *Id.* at 6-8, 11-12, 16.  Nor could making a referral of suspected misconduct have an adverse impact on Muszik, where Henderson was not the final decisionmaker of any investigation she may have instigated. *Id.* at 10-11, 16-17, 28-29.  Defendants also argue that the fact that Muszik was not deterred from further First Amendment activity demonstrates the lack of adverse impact. *Id.* at 20-24.  Further, Defendants dispute that Muszik's February 2020 initiation of the 70.51 dispute resolution process or the scheduling of depositions in her lawsuit are protected activities that could be causally connected to the alleged retaliatory acts, *id.* at 9, 16, 18, and they argue that the timeline of relevant events is far too removed for Muszik to show a causal connection through temporal proximity. *Id.* at 25.  In any event, Defendants contend that Henderson is protected by qualified immunity because she acted within the scope of her discretionary authority, and it is not clearly established law that an elected official cannot refer suspected illegal activity to the proper authorities. *Id.* at 26-27.  Finally, the Town argues it is not liable for Henderson's alleged conduct because the mayor is a ceremonial position that does not carry final policymaking authority, particularly with respect to the investigations Plaintiff alleges constitute retaliatory actions. *Id.* at 27-30.

Responding in opposition, Plaintiff argues that Defendants' narrow framing of the issues ignores the evidence demonstrating the existence of a retaliatory course of conduct—Henderson's "coordinated campaign[] of harassment and intimidation"— that would have deterred a person of ordinary firmness from engaging in the protected speech. Doc. 27 at 14-15.  Plaintiff contends that filing false reports of unlawful activity

has been found to have sufficiently adverse impact to chill speech. *Id.* at 22.  Nor can causing costly delays in construction be considered *de minimis*. *Id.* at 22-24.  Here, the pattern of reports, inspections or other impediments occurring before "[e]ach time Muszik was to appear at Town Hall and exercise her First Amendment rights" is "unmistakable," morphing beyond mere coincidence into evidence of retaliatory animus. *Id.* at 16-19, 22-25.  Both the 70.51 proceeding and Muszik's lawsuits entailed ongoing, active protected speech that can be found to be causally connected to the retaliatory acts. *Id.* at 17-18, 22-23.  Plaintiff further argues that a reasonable jury could conclude, viewing the evidence in the light most favorable to Plaintiff, that Henderson colluded with Palmer to file the FEC complaint and respond to the title company. *Id.* at 20-21, 24-25.  Moreover, Henderson's involvement in the retaliatory acts she admits to went far beyond merely referring suspected wrongdoing to the proper authorities. *Id.* at 18, 23.  Because clearly established law has long prohibited the government from retaliating against citizens for the exercise of First Amendment rights, qualified immunity does not protect Henderson. *Id.* at 15.  With respect to municipal liability, Plaintiff contends that Henderson had sufficient authority as mayor, both officially and in practice, to be considered a final policymaker for the retaliatory acts. Doc. 27 at 12-14.

In reply, Defendants challenge Plaintiff's characterization of the evidence and the credibility of a witness account on which Plaintiff relies in her arguments about Henderson's retaliatory motive and behind-the-scenes involvement. Doc. 28.

An oral argument took place on March 4, 2024.  Docs. 38, 39.  Plaintiff asked the Court to consider the entire history between Muszik and Defendants and the pattern of actions taken by Town officials that adversely affected her during her period of First Amendment activities.  Defendants, in turn, emphasized Henderson's own First Amendment rights and the dearth of evidence tying each allegedly retaliatory action to an act of protected speech.

## II.    LEGAL STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).  In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).  Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law.  *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support

17

the nonmoving party's case." *Celotex*, 477 U.S. at 325.  "Only when that burden has been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020) (citing *Anderson*, 477 U.S. at 249-50).  "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019).  Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770 (quoting *Anderson*, 477 U.S. at 252).

## III.   DISCUSSION

### A. Qualified Immunity as to Count I

In Count I, Muszik alleges that Henderson violated 42 U.S.C. § 1983 by retaliating against Muszik for the exercise of her First Amendment rights. Doc. 1 ¶¶ 40-44(a).  Defendants first argue that Henderson is protected from individual liability by the doctrine of qualified immunity. Doc. 23 at 25-27.  The Court will consider the question of qualified immunity before reaching the merits of the First Amendment retaliation claim against Henderson.  In doing so, it will assume, *arguendo*, that the evidence, viewed in the light most favorable to Muszik, creates a genuine dispute of material fact as to whether Henderson violated Muszik's right to be free from First Amendment retaliation. *See*, *e.g.*, *Pearson v. Callahan*, 55 U.S. 223, 236 (2009) (courts

considering qualified immunity are permitted to address whether a constitutional right is clearly established before determining whether it was violated).

 "Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). The defendant seeking to invoke qualified immunity bears the initial burden of demonstrating that she was acting within the scope of her discretionary authority when the alleged wrongful conduct occurred. *Id.* (citation omitted). The burden then shifts to the plaintiff to demonstrate that qualified immunity does not apply, by showing that the defendant's conduct violated a constitutional right that was clearly established at the time it occurred. *Id.* (citation omitted).

Defendants contend that Henderson acted—to the extent they concede she took any actions in connection with Muszik's allegations—within the scope of her discretionary authority, because referring potential violations to the proper officials fell within her mayoral duty to uphold the laws of the Town and state. Doc. 23 at 25-26. Defendants further argue that it is not clearly established law that an elected local official cannot report suspected violations of the law or building code where the person being reported is engaged in other disputes with the elected official's agency. *Id.* at 26-27.

Muszik did not dispute in her response in opposition to the motion for summary judgment that Henderson was acting within her discretionary authority when she committed the allegedly retaliatory actions. Doc. 27 at 15. Muszik asserted at the oral

19

argument that the specific actions she alleges Henderson took went far beyond the scope of her official duties, because Henderson went far beyond merely reporting suspected violations.  But Muszik largely focuses her qualified immunity argument on the second step of the analysis, arguing that the record evidence shows Henderson violated clearly established law when she "engaged in a concerted effort to intimidate and harass Muszik in retaliation for her protected speech." *Id.*  She contends that Defendants frame the issue too narrowly, because it has been settled law in the Eleventh Circuit since 1988 that "the government may not retaliate against citizens for the exercise of First Amendment rights." *Id.*, *citing Bennett v. Hendrix*, 423 F.3d 1247, 1255 (11th Cir. 2005).

The Court finds that qualified immunity applies.  First, Henderson was acting within her discretionary authority during the conduct alleged.  For qualified immunity purposes, a government employee acting within their discretionary authority must be "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  A court must "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.* at 1266.  Applying this test, and setting aside Henderson's alleged retaliatory animus, the Court finds that her alleged conduct in both reporting and pursuing the investigation of suspected violations falls within the outer perimeters of her job-related duties as the

town mayor.  Accordingly, the burden shifts to Muszik for the second step of the qualified immunity analysis.

A plaintiff seeking to meet her burden under the second step of the qualified immunity analysis can demonstrate that a right or law was clearly established in three ways. *See, e.g., Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (citation omitted).  First, she may show that a "materially similar case has already been decided," in which the judicial precedent is "tied to particularized facts." *Id.* (quotation omitted).  This inquiry considers whether "the factual scenario that the official faced is fairly distinguishable from the circumstances facing a governmental official in a previous case." *Id.*  Second, the plaintiff may point to a broader, clearly established principle that should control the novel facts of her situation. *Id.*  For this option, the principle must be "established with obvious clarity by the caselaw so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* at 1205 (quotation omitted).  Third, the plaintiff may fall within a "narrow" category of situations in which the official's conduct "lies so obviously at the very core of what the relevant constitutional provision prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Id.* (quotations and modifications omitted).

In all, to determine whether qualified immunity applies, "the salient question…is whether the state of the law [at the time] gave [defendants] fair warning that their alleged treatment [of plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S.

730, 741 (2002).  Moreover, "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 926 (11th Cir. 2000) (quotation and citations omitted).

Muszik relies exclusively on a general principle announced in *Bennett v. Hendrix*, 423 F.3d 1247, 1255 (11th Cir. 2005), to argue that the law was clearly established.  In *Bennett*, the Eleventh Circuit found that the plaintiff's First Amendment retaliation claim fell within the second category of clearly established law, because it has long been "settled law…that the government may not retaliate against citizens for the exercise of First Amendment rights"; the defendants were therefore on notice that doing so would violate the plaintiffs' constitutional rights.

In the years since *Bennett* was decided, however, courts have made clear that this broad principle does not resolve with "obvious clarity" the specific legal questions at issue in First Amendment retaliation cases. *See Loftus*, 690 F.3d at 1204.  After all, the Supreme Court has "repeatedly told courts…not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); *see also Bailey v. Wheeler*, 843 F.3d 473, 484 (11th Cir. 2016) (the inquiry of whether law is clearly established is conducted "in light of the specific context of the case, not as a broad general proposition.") (quotation omitted).

Where a plaintiff alleges First Amendment retaliation, "the right in question," for qualified immunity purposes, "is not the general right to be free from retaliation for one's speech[.]" *Reichle v. Howards*, 566 U.S. 658 (2012).  Rather, the court must examine whether it is clearly established that there is a right to be free from the specific

conduct alleged. *Id.* (holding there was no clearly established right to be free from a retaliatory arrest that was supported by probable cause); *see also Echols v. Lawton*, 913 F.3d 1313, 1324-25 (11th Cir. 2019) (the general principle from *Bennett* that government may not retaliate against citizens for the exercise of First Amendment rights "does not resolve with obvious clarity that defamation may constitute retaliation" such that the law was clearly established, where a circuit split existed*)*; *Betancourt v. Fla. Dep't of Corr.*, --- F.Supp.3d ---, No. 4:23-CV-308-AW-MAF, 2023 WL 7548194, *2 (N.D. Fla. Nov. 13, 2023) (same, where plaintiff alleged First Amendment retaliation in the form of being fired for not reciting the Pledge of Allegiance); *Hernandez v. City of Homestead, Fla.*, No. 21-CV-21536, 2022 WL 6569684, at *15–16 (S.D. Fla. Aug. 8, 2022) (same, where plaintiff claimed a hostile work environment, giving negative information to prospective employers, and conducting an undisclosed investigation constituted First Amendment retaliation), *report and recommendation adopted,* 2022 WL 4144345 (Sept. 13, 2022).

With these standards in mind, a closer examination of *Bennett* reveals that the principle it establishes with "obvious clarity," for qualified immunity purposes, is narrower than the very broad principle on which Muszik relies. *Cf.* Doc. 27 at 15. The plaintiff in *Bennett* alleged that the sheriff led a campaign of retaliation and intimidation against the plaintiffs because of their support of a referendum that would have diminished the power of the sheriff's department. 423 F.3d at 1248-49. The acts of intimidation, which the court described as a "prolonged and organized campaign

of harassment by local police officers," included surveilling the plaintiffs' homes, stopping their cars without reason, issuing false traffic citations, and mailing defamatory flyers to county residents. *Id.* at 1249, 1254. After surveying caselaw from other circuits, the court found that the plaintiffs alleged retaliatory acts that a jury could find would deter a person of ordinary firmness from the exercise of First Amendment rights. *Id.* at 1254-55. The Eleventh Circuit later summarized *Bennett* as standing for the "obvious" principle that law enforcement officers may not use their position to harass and intimidate individuals in retaliation for exercising their First Amendment rights. *Bailey v. Wheeler*, 843 F.3d 473, 485 (11th Cir. 2016).

In this case, however, Muszik does not allege that law enforcement officers engaged in retaliation against her. Rather, she argues that the mayor directed a "concerted effort to intimidate and harass" her, which primarily involved requesting that she be investigated for purported violations of state and local laws or otherwise impeded. Doc. 27 at 15; *see* Doc. 1 ¶¶ 43(a), 44(b). But she offers no authority besides *Bennett* to support the claim that this conduct would constitute a clearly established violation of law. *Cf.*, *e.g.*, *Rehberg v. Paulk*, 611 F.3d 828, 850-51 (11th Cir. 2010) (the right to be free from retaliatory investigation is not clearly established). Her assertion at oral argument that *Bennett* constitutes clearly established law that the First Amendment prohibits any pattern of retaliatory harassment is still far too broad. *Bennett* does not provide the "obvious clarity" that would give Henderson fair notice that Muszik had a constitutional right to be free from the specific conduct alleged. Absent any other authority, Muszik has not met her burden of demonstrating that

Henderson's alleged conduct violated a clearly established constitutional right. Accordingly, Defendants' motion for summary judgment as to Count I is due to be granted.

### B. Municipal Liability as to Count II

In Count II, Muszik alleges that the Town is liable for the same acts of First Amendment retaliation as Count I, because they were committed at the direction of Henderson, who was the Town's official and *de facto* policymaker. Doc. 1 ¶ 44(b). Defendants argue that Muszik has failed to establish municipal liability, because she has not demonstrated that Henderson was a final policymaker[9] or that the Town had a custom or policy of retaliation as to each retaliatory act. Doc. 23 at 27-28.  On the contrary, Defendants contend that Henderson's position as mayor was ceremonial, and that she lacked final decisionmaking authority over any of the acts alleged. *Id.* Muszik responds that the evidence demonstrates that Henderson's power extended well beyond the ceremonial; she was deeply involved in Town affairs, including the retaliatory acts. Doc. 27 at 12-14.  This time, the facts support Plaintiff's argument.

In *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the Supreme Court held that local governing bodies may be sued under 42 U.S.C. § 1983 for constitutional violations where the action that is alleged to be unconstitutional is taken in accordance with the municipality's policy or custom.   Although a municipality may not be held liable under a *respondeat superior* theory solely because it

---

[9] *Cf.* Doc. 28 at 8 (in reply, stating that "it isn't apparent" why Muszik argued in her response in opposition that Henderson was a policymaker).

employs a tortfeasor, it may be liable for the acts or decisions of officials with final policymaking authority in the area of the act or decision. *McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir. 1996) (citations omitted).

To determine whether an official has final policymaking authority, courts look to state and local law as well as custom and usage having the force of law. *Id.* An official or entity may be a final policymaker with respect to some actions but not others, and final policymaking authority may be shared with respect to a particular action. *Id.* A government official is a final policymaker only if her decision has legal effect without further action by the governing body, and if there is no "actual opportunity for meaningful review" of the decision. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1291-92 (11th Cir. 2004) (citations omitted). An opportunity for review will not be considered "meaningful" or "actual" merely because it exists on paper; the court will instead consider whether the opportunity was "meaningful" and "actual" under the particular circumstances of the act in question. *Id.* at 1193.

Here, Defendants argue that Henderson was not a final policymaker because her position as mayor was merely ceremonial under the Town Charter, which delegates decision-making authority only to the Commission. However, the evidence demonstrates that Henderson held significantly more than ceremonial authority during the events in question. As mayor, Henderson was, herself, a commissioner. Defendants fail to acknowledge that she had the unfettered ability to appoint herself and her fellow commissioners to oversee the Town's departments, and remove them from these positions at her sole discretion. Henderson held all three significant

positions of responsibility at varying times; at one point she held all three at once. While she was Building Commissioner she had authority to sign off on permits and remove the Building Official.

There is also evidence from which a jury could conclude that Henderson possessed and exercised a great deal of *unofficial* control over town affairs. *See McMillian*, 88 F.3d at 1577 (policymaking authority may exist based on "custom and usage having the force of law").  She had direct access to commissioners' email accounts and all officials' phone logs.  Although any citizen or commissioner could request a particular record under public records laws, there is no evidence that other commissioners had the same direct means of access as Henderson.  Multiple witnesses also testified about the close relationship between Henderson and Mary Palmer, the Town Clerk, which they observed to include Henderson having full access to Palmer's computer and email account, as well as influence over her actions.

Most significantly, there is evidence that Henderson exercised influence over some of the retaliatory acts Muszik alleges, even if they did not fall within her statutory purview.  With respect to the homestead investigation, Henderson made at least one report of suspected fraud and placed at least two phone calls to the Property Appraiser's Office in which she reiterated her suspicion while identifying herself as the Mayor of Redington Shores.  When the auditor was not available to investigate immediately, Henderson suggested that the Town's code enforcement officer, Danny Doherty, investigate instead.  She then persuaded Doherty to leave his home and go back on-duty to do so.  Doherty testified that he would not have done this if she had

been a regular citizen, and that he had never before participated in a Property Appraiser's Office investigation.  With respect to the stop work order for the lack of notice for pile driving, Building Official Neal Mazzei explained that he would not have enforced his interpretation of the notice provision if Henderson had not asked him to, and that he never had before.  Both of these incidents provide strong evidence that Henderson used her influence as the mayor to trigger actions against Muszik.[10]

There are also two acts of alleged retaliation over which a reasonable jury could conclude Henderson exercised influence, even in the absence of direct evidence.  Mary Palmer was the official who made the unfounded election complaint against Muszik and provided erroneous information about Muszik's property to the title company.  For the election complaint, neither Palmer's complaint nor her deposition testimony identified the error she claimed to believe existed in Muszik's political ad.  And neither Palmer nor the Town could explain why they gave the title company incorrect information about the long-closed code violation.  Given the testimony from multiple sources about Henderson's relationship with and influence over Palmer, a jury could

---

[10] For this reason the Court is not persuaded by Defendants' supplemental citation to *Lindke v. Freed*, 601 U.S. ---, 144 S.Ct. 756 (2024), in which the Supreme Court emphasized that public officials possess a First Amendment right to speak about public affairs in their personal capacities. *See* Doc. 40.  Here, however, the evidence demonstrates that Henderson purported to act as the mayor rather than as a private citizen at the time she instigated the Town's actions. *See Lindke*, 144 S.Ct. at 769-770 (in the context of the state-actor analysis for claims under 42 U.S.C. § 1983, courts must consider whether the official purported to use state authority by speaking in her official capacity or using her speech to fulfill official responsibilities); Doc. 23-12 at 326 (Henderson explaining that she called the Property Appraiser's Office "because it is my fiduciary responsibility."); Doc. 23-12 at 118 (confirming that she was acting as the mayor, not a citizen, when she contacted the Property Appraiser's Office about Muszik).

reasonably choose not to credit Palmer's and Henderson's denials of Henderson's involvement in either incident.[11]

On the other hand, the evidence regarding Henderson's mayoral influence over code enforcement investigations against Muszik during the relevant time frame is scant.  There is evidence that Henderson once asked Bruce Cooper to check whether Muszik had a permit for the electrical work she was having done; it turned out she did not.  But Henderson had a routine and long-standing practice of making code violation reports throughout the Town, both before and after she became a commissioner and mayor.  And it appears that many code violation reports and other complaints about Muszik's properties, including Blackburn's 2020 report about the ground floor, came from neighbor Leslee Coppock.  There is simply not enough evidence that Henderson acted as a policymaker, rather than a resident, with respect to any code violation reports she made about Muszik's properties.  Accordingly, there is no genuine issue of material fact as to the Town's municipal liability for code enforcement violations, and the Town is entitled to summary judgment as to these alleged retaliatory acts only.[12]

---

[11] The Court agrees with Defendants' argument in their reply that Jeanette DeMarco's account of either incident is too vague to constitute evidence that would defeat summary judgment. Doc. 28 at 4-5.  However, the Court disregards the attacks on DeMarcus's credibility. *Id.* at 5-7.  It is well-settled that a court may not weigh conflicting evidence or make credibility determinations in ruling on a motion for summary judgment, and must view the evidence in the light most favorable to the non-movant. *See*, *e.g.*, *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) (citations omitted).

[12] In the alternative, even if municipal liability existed, the Court would find that there is insufficient evidence upon which a jury could find the Town liable for First Amendment retaliation with respect to the code violation report.  There is inadequate evidence that the Town or Henderson acted with a retaliatory motive with respect to Henderson's accurate report about unpermitted work, or that the report would have deterred a person of ordinary firmness from exercising their First Amendment rights. *See* Section IV(C), *infra*.

Defendants further argue that Henderson was not the "final" policymaker for any of the allegedly retaliatory acts, because the ultimate resolution of the investigations was not in her hands.  However, the Court finds the reasoning of the court in *Sweet Sage Café, LLC v. Town of North Redington Beach, Fla.*, 380 F.Supp.3d 1209 (M.D. Fla. March 29, 2019) (Jung, J.) to be persuasive on this point.  The *Sweet Sage* court concluded that municipal liability could exist for the "nuanced municipal action[s]" of *inspecting* for code enforcement in an unconstitutional manner because "the inspections themselves are problematic." *Id.* at 1218-19.  It was therefore immaterial that the identified policymaker, the town attorney, was not the person responsible for deciding whether a reported issue was actually a violation, where the evidence showed he acted alongside the town commission in making code enforcement decisions. *Id.*  Here, too, the Court understands the alleged retaliatory acts to be the *initiation* of various types of investigations and other means of obstructing Muszik's projects, rather than the outcome.  Defendants have identified no actual opportunity for meaningful review of the initiation of the investigations.  There is sufficient evidence from which a reasonable jury could find that Henderson, in her official capacity, directed town officials to initiate these acts, such that the acts may fairly be said to represent official Town policy.  Accordingly, Defendants are not entitled to summary judgment based on municipal liability with respect to any act other than the code enforcement violations.

## C. The Merits of Count II

The remaining allegations of Count II are that the Town, at Henderson's direction, retaliated against Muszik via: i) the homestead investigation, ii) the Florida Election Commission complaint, iii) the stop work order, and iv) the title company response. Doc. 1 ¶ 44(b).  The allegedly retaliatory acts were taken in response to Muszik's constitutionally protected speech in the form of her: i) participation in Town meetings and opposition to the vacation rental ordinance, ii) initiation of a statutory dispute resolution proceeding against the Town, iii) lawsuit against the Town, and iv) payment for a political advertisement in support of Henderson's opponent. *Id.* ¶ 43(b).

A defendant is liable for First Amendment retaliation when: (1) the plaintiff engaged in constitutionally protected speech, (2) the defendant's conduct adversely affected the protected speech, and (3) a causal connection exists between the speech and the defendant's retaliatory actions. *Bailey v. Wheeler*, 843 F.3d 473, 480-81 (11th Cir. 2016).  Defendants' motion for summary judgment challenges all three elements.

With respect to the first element, the Court has no difficulty concluding that Muszik engaged in protected First Amendment activity when she voiced political opinions, sought relief from a Town decision through a dispute resolution proceeding, sued the Town multiple times, and paid for a political advertisement.  Defendants do not dispute that her political expressions and lawsuits are protected by the First Amendment.  Indeed, "[t]he First Amendment affords the broadest protection" to political expression that takes the form of "[d]iscussion of public issues and debate on the qualifications of candidates[.]" *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (overruled

on other grounds).  It also explicitly protects the right to "petition the government for a redress of grievances," U.S. Const. Am. I, which includes a citizen's lawsuit against the government. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019).

Defendants argue that Muszik's participation in the dispute resolution proceeding is not comparable to a lawsuit, and therefore is not a protected activity, because the procedure under Florida Statutes § 70.51 was "designed specifically to *avoid* litigation[.]" Doc. 23 at 9 (emphasis in original).  But this view is too narrow, because the Supreme Court has long recognized that the First Amendment right to petition extends beyond the right of access to the courts, and protects the approach of a citizen to "all departments of the government." *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).[13]  Section 70.51 plainly provides a means of petitioning the government for a redress of grievances.  Its dispute resolution procedure is available only to property owners who believe that a government action "is unreasonable or unfairly burdens the use of [their] property," and it is initiated by filing "a request for relief" with the government entity that took the action. Fla. Stat. §§ 70.51(3), (4).  Although the procedure is not a judicial cause of action, it involves a citizen announcing her dissatisfaction with a government action in the hope of a

---

[13] *See also Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 382 (2011) ("[p]etitions are a form of expression, and [those] who invoke the Petition Clause in most cases could invoke as well the Speech Clause of the First Amendment.").

favorable resolution.  Muszik's engagement with this procedure is an activity that is protected by the First Amendment.

Next, under the second element of retaliation, the Defendants' alleged conduct must adversely affect Muszik's protected activity.  "[A] defendant adversely affects protected speech if his alleged retaliatory conduct 'would likely deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Bailey*, 843 F.3d 473, 481 (11th Cir. 2016), quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005).

Detailing a three-page list of First Amendment activities in which Muszik has engaged or still intends to engage, Defendants point out that she has not been deterred from continuing to exercise her First Amendment rights. Doc. 23 at 21-24.  As a result, "[a]ssuming she is a person of ordinary firmness," Defendants assert that a reasonable jury would not conclude that any alleged Town conduct had an adverse effect on speech. *Id.* at 24.   This argument is self-defeating.   The ordinary firmness test is objective, as Defendants acknowledge. *Id.* at 21; *Bennett v. Hendrix*, 423 F.3d 1247, 1251 (11th Cir. 2005).   Therefore it is not dispositive that Muszik herself was not deterred.  And Defendants' laundry list of Muszik's actions—which continued even after she no longer owned property in the Town—serves to illustrate that she is likely *not* a person of ordinary firmness, contrary to Defendants' unsupported assumption. *See Sweet Sage Café, LLC v. Town of North Redington Beach, Fla.*, 380 F.Supp.3d 1209, 1222 (M.D. Fla. 2019) (rejecting a similar argument because the plaintiff "has given every indication that he is not a person of ordinary firmness," and finding that the second element was a "factual question…for the jury."); *see also Abella v. Simon*, 522 F.

App'x 872, 874 (11th Cir. 2013) ("Although Abella was not deterred…those actions 'would likely deter a person of ordinary firmness from the exercise of First Amendment rights.'") (quoting *Bennett*).

To satisfy the ordinary firmness test, an adverse effect on the freedom of speech "need not be great[.]" *Bennett*, 423 F.3d at 1254. The test is intended to "weed[] out" only those injuries that are "trivial or amount to no more than *de minimis* inconvenience in the exercise of First Amendment Rights." *Id.* at 1253. The *Bennett* court provided examples of actionable retaliation from prior cases that included "the issuance of parking tickets totaling $35," an unreasonably long police detention of a car with guns drawn, and a "campaign of petty harassments." *Id.* at 1255 (citations omitted); *see also Abella*, 522 F. App'x at 874 (actions of "being followed, stopped, ticketed, and intimidated" by police officers passed the ordinary firmness test); *Pittman v. Tucker*, 213 F. App'x 867, 870-71 (11th Cir. 2007) (a reasonable jury could find that a corrections officer's threat to do "something drastic" if inmate plaintiff continued to file grievances was sufficient to deter a person of ordinary firmness from doing so). In another case alleging a retaliatory course of conduct by a town against a property owner, a court in this District found that there was a genuine question of material fact as to adverse effect. *Kaleta v. City of Anna Maria*, No. 8:16-cv-347, 2017 WL 4417673, *5 (M.D. Fla. Oct. 3, 2017) (Whittemore, J.). The defendant-town in *Kaleta* had allegedly imposed arbitrary construction requirements to the plaintiffs' properties, demanded unlawful payments, issued stop work orders, shut off utilities, filed an

administrative complaint, passed ordinances negatively affecting the properties, and engaged in a campaign of petty harassment. *Id.*

Here, the Town's allegedly retaliatory actions were not as severe or extensive as those in *Kaleta*, but they were similar in nature. Town officials prompted the initiation of two government investigations that could have resulted in financial penalties, and caused costly delays in construction and a property sale. These actions were neither trivial nor amounted to mere *de minimis* inconvenience. *See Bennett*, 423 at 1253. In addition, Muszik attests that the FEC complaint dissuaded her from publishing a second political advertisement, which is a direct adverse effect on her protected speech. Viewing the evidence in Plaintiff's favor, a reasonable jury could find that the Town's actions were sufficient to deter a person of ordinary firmness from exercising their First Amendment rights.

The final retaliation element, a causal connection between the actions and the protected activity, presents the closest question. To make out this prong, a plaintiff pursuing a First Amendment retaliation claim must show that the adverse action "would not have been taken absent the retaliatory motive." *Houston Comm. College System v. Wilson*, 595 U.S. 468, 477 (2022), quoting *Nieves v. Bartlett*, 587 U.S. ---, 139 S.Ct. 1715, 1722 (2019). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured"; rather, the motive must be a "but-for" cause of the injury. *Nieves*, 139 S.Ct. at 1722 (citations omitted). Circumstantial evidence, such as temporal proximity, may be used to demonstrate a defendant's

retaliatory motive. *See*, *e.g.*, *Indigo Room, Inc. v. City of Fort Myers*, 589 F. App'x 938, 947 (11th Cir. 2014).

For two of the alleged retaliatory acts, the FEC complaint and the homestead investigation, there is clear evidence from which a jury could infer a causal connection with Muszik's protected speech.  The FEC complaint is the most straightforward.  Its subject was Muszik's political advertisement, which was critical of Henderson and supportive of Henderson's opponent.  Palmer made the complaint the same day the ad came out.  It was the only time Palmer had ever made an FEC complaint, and not only was the complaint unfounded but Palmer could not even articulate what about the ad she had believed violated the law.  And, as discussed *supra* in Section III(B), a jury could infer that Henderson directed Palmer to make the complaint despite the absence of direct evidence.   There are genuine disputes of fact as to whether a retaliatory motive caused the FEC complaint.

With respect to the homestead investigation, Henderson linked it to Muszik's First Amendment activity herself when she announced what she believed the investigation had uncovered during a public discussion about the relief Muszik sought in her 70.51 petition.  The discussion immediately preceded a vote on the relief Muszik sought, which Henderson opposed.  Retaliatory animus may be further inferred from the unusual nature of Henderson's actions, which she took shortly before the vote meeting.  Although she had reported other suspected homestead violations in the past, she had never spoken directly to the Property Appraiser's Office investigator, sent a local law enforcement officer to investigate, or had the officer leave his home after

being off-duty to do so.  A reasonable factfinder could conclude that Henderson would not have taken the same actions if she had not wanted to retaliate against Henderson for her advocacy regarding the rear setback.[14]

A reasonable jury could also find that a retaliatory motive underlay the Town's actions with respect to the title company response.  The code violation on which the Town's response to the title company was based was addressed and resolved in 2018, as demonstrated by Walker's final inspection report.  The report and the photos that Walker took should have been among the Town's records.  Muszik even brought them to Bruce Cooper's attention after Blackburn's report in 2020.[15]  Yet in 2021 Palmer represented to the title company that the code violation remained open, an action she could neither explain nor recall at her deposition.  Then, even when presented with a copy of Walker's report, the Town did not modify its response to the title company. This series of events could be explained by innocent record-keeping errors, frequent turnover in the position of Building Official, and bureaucratic intransigence. However, it would not be unreasonable for a factfinder to find that such a significant

---

[14] Defendants argued at oral argument that a causal connection could not exist because the protected activity did not predate Henderson's homestead investigation, as the 70.51 proceeding settlement had not yet come before the Commission.  This argument does not fairly characterize the evidence.  The Commission had voted against Muszik's variance appeal the previous year, so it was not a new issue.  Moreover, in the weeks between the October 2020 magistrate hearing and the November 2020 Commission meeting, Muszik sent the commissioners multiple emails advocating for her position. *See* Doc. 23-12 at 325-327 (referencing Muszik's emails).  In fact, Henderson stated that receiving Muszik's emails is what led her to begin the homestead investigation. *Id.* at 326.

[15] Indeed, the Town's electronic records system contained a note that the unpermitted work on the ground floor was removed in July 2018. Doc. 23-3 at 91.

error resulted from retaliatory animus, and to infer that Henderson—who had full access to Palmer's email account and Town records, and who served as the Building Commissioner during Cooper's 2020 investigation of the violation—was involved behind the scenes.

On the other hand, the opposite conclusion is warranted as to the stop work order, because there is strong evidence that it would have been issued even without a retaliatory motive.  Plaintiff relies on the fact that Henderson directed Neal Mazzei to strictly enforce the notice provision, which he had never enforced before, and which her expert opined did not apply to her project.  However, it is undisputed that a different construction project was driving piles during the same week as Muszik's project, prompting many resident complaints and Lisa Foster's identification of the building code's purported requirement of notice to adjacent properties.  The existence of a different project that was causing an "onslaught of emails and phone calls" to Town Hall, Doc. 23-16 at 49, demonstrates another cause besides retaliation for Henderson's action in directing Mazzei to begin enforcing the notice provision, even if she *also* had a retaliatory animus in doing so. *See Nieves*, 139 S.Ct. at 1722 ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured[.]").[16]

---

[16] In addition to Henderson's involvement in directing Mazzei to enforce the notice provision, Henderson is also the person who reported that Muszik's crew was driving piles without notifying her.  Unlike with her enforcement directive, however, there is no evidence that Henderson was acting as the mayor when she made the report, rather than as a resident and concerned property owner just like Foster and her neighbors.  Moreover, Plaintiff alleges that

Plaintiff has not presented any evidence that refutes or casts doubt on Foster's testimony about the second project, which was corroborated by Mazzei and Linda Krouk.  Nor does the evidence call into question Mazzei's testimony that he issued the stop work order because he shared Foster's interpretation of the building code.  He explained at his deposition that the requirement was not usually enforced because construction companies typically complied with the notice provision without the need for enforcement.  Even assuming, without deciding, that Muszik's expert is correct that the notice provision did not apply to Muszik's project, there is no evidence from which a jury could infer that Mazzei intentionally misinterpreted it in order to comply with Henderson's directive.  Unlike with Palmer, there is no evidence of a close relationship between Henderson and Mazzei.  Nor is it plausible that Mazzei, who is employed by a contractor company, would be influenced by a threat of termination.[17]  On the contrary, he testified that he could lose his license if he misapplied the code, and that he was trained to withstand political pressure. Doc. 23-8 at 42-43.   In all, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not conclude that retaliation was the but-for cause of the stop work order.

---

the retaliatory act was that Henderson directed Mazzei to issue a stop work order, not the report itself. Doc. 1 ¶ 44.

[17] Removal as the Town's Building Official did not carry serious consequences for company employees.  For example, after Bruce Cooper was removed as the Town Building Official on the Town's request, the company simply reassigned him to a different town nearby.  *See* Doc. 23-3; Doc. 23-8 at 6-7, 30-31.  Indeed, Mazzei was reassigned soon after issuing the stop work order. *Id.*

Plaintiff argues that a causal connection is plausible because of the temporal proximity between the stop work order and the two depositions for her lawsuit that were about to occur.  The Court agrees with Defendants that the occurrence of the depositions themselves was too minor of an event to persuade a reasonable jury that a causal connection existed; nor has Plaintiff established that Henderson even knew about them.  It is certainly relevant that Muszik was actively litigating against the Town at the time the stop work order was issued, and her long history of critical speech must be considered as well when evaluating possible retaliatory animus.[18]  But this backdrop does not erase the existence of a non-retaliatory cause for the stop work order.  Defendants are entitled to summary judgment as to the stop work order.

Therefore, as to Count II, Defendants' motion for summary judgment is granted as it relates to Plaintiff's allegations that retaliation took the form of code violation reports and the stop work order.  It is otherwise due to be denied.

Accordingly, it is **ORDERED**:

1. Defendants Town of Redington Shores, Florida ("the Town") and Marybeth Henderson's Dispositive Motion for Summary Judgment (Doc. 23) is GRANTED-IN-PART and DENIED-IN-PART.

---

[18] In this regard, the Court disagrees with Defendants' argument that only an immediately preceding event, rather than the full history of Muszik's critical speech, should be considered when determining if a causal connection exists.  Although her past speech and ongoing advocacy *alone* are not enough to demonstrate a causal connection, *see Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (temporal proximity must be "very close" if it is the sole evidence of causation), they provide important context in a determination of the Town's subjective intent.

2. The Motion is granted as to Count I.  As to Count II, the motion is granted to the extent set forth in this Order, and is otherwise denied.

3. To avoid piecemeal judgments, a final judgment in favor of Defendant Henderson as to Count I will be entered at the conclusion of this litigation.

4. Within fourteen (14) days, the parties shall file a notice on CM/ECF which identifies their availability for trial during the remaining months of 2024 and up through August 2025.

**DONE** and **ORDERED** in Tampa, Florida on May 20, 2024

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties